GARVIN et al. *v.* STATE.

In Banc. Dec. 12, 1949

No. 37219 (43 So. (2d) 209)

**Smith & Jones,** for appellants.

**George H. Ethridge**, Assistant Attorney General for appellee.

**McGehee, C. J.**

The defendants Alex Garvin and Ben Rhodes, alias Jack Rhodes, were jointly indicted, tried and convicted of the crime of grand larceny, because of a fraudulent scheme whereby they were alleged to have obtained the sum of $350 from one Leon Cooks and his wife, Gertrude Cooks, with intent to steal the same, the jury having found from the evidence that the victims of the fraudulent scheme did not intend to part with title to their money but gave it to them with the understanding that it should be returned to Leon when it had served the pretended purpose for which its possession was obtained.

The contention of the State that the obtaining and keeping of the money, under the facts and circumstances to be hereinafter stated, constitutes the crime of grand larceny instead of obtaining money under false pretenses, is sustained by the principles announced in the cases of Courtney v. State, 174 Miss. 147, 164 So. 227; Foster v. State, 123 Miss. 721, 86 So. 513; Dukes v. State, 181 Miss. 704, 181 So. 518; and Alford v. State, 193 Miss. 153, 8 So. (2d) 508. That is to say, that where any personal property is fraudulently obtained under such circumstances from an owner who intends that the title thereto shall not pass, the offense is grand larceny, but where he intends that the ownership or legal title

should pass the offense is that of obtaining money under false pretenses.

The money was obtained from the complaining witnesses Leon Cooks and Gertrude Cooks as victims of a practice known as "pigeon-dropping". In the instant case the scheme was worked in the following fashion:

The victims of the transaction were tenants on the farm of J. D. Moody near Shaw, Mississippi. On Monday, October 11, 1948, Leon Cooks received from his said landlord a check for $350.02 in partial settlement of his share of the proceeds of his cotton crop. On the following Saturday he carried another bale of cotton to town to be ginned, and while waiting his turn at the gin he and his wife Gertrude went to a local bank where she assisted him in getting the check cashed, since he was unable to read or write. Thereupon his wife returned home with the $350.02, leaving her husband Leon to await the ginning of his bale of cotton.

Leon, who knew that he would have a long wait at the gin walked around to the picture show to see what would be shown on that day or to find out about the coming attractions. While looking at the advertisements there a "little low fellow" walked up to him and "gave the name of Smith", who was later identified as being the defendant Alex Garvin. While those two were engaged in conversation the "little low fellow" called Leon's attention to the fact that a fellow across the street was picking up a pocketbook. The pretended finder of the pocketbook was "a big tall fellow", later identified as the defendant Ben Rhodes, and he had evidently placed the pocketbook on the sidewalk or ground as a part of the fraudulent scheme. Thereupon the "big tall fellow", came across the street, introduced himself as "Porter", and said to his confederate "Smith" and to Leon Cooks that he had "found a pocketbook that had $2,100.00 in it", and declared that " he had a boss man that was a millionaire and he didn't need the

money." He then outlined a plan whereby the alleged $2,100 was to be divided equally between himself, his confederate "the little low fellow", and his intended victim Leon Cooks.

It seems that the plan included a proposal that the money should be divided by the boss man of "the big tall fellow" so as to give the finder $700 thereof and $700 to each the "little low fellow" and the intended victim. But it appears that before this could be done there was a minor detail to be looked after in that the intended victim Leon Cooks must first disclose that he already had some money. The defendants claimed that the $2,100 could not be divided until Leon could thus qualify to participate in the division, and Leon's money was to be turned over to "the big tall fellow" in order that he may go show it to the boss man of the latter and thus prove that Leon was qualified to share in the money that had been allegedly found.

It may be reasonably inferred from all the facts and circumstances that the two perpetrators of the fraud had doubtless seen Leon and his wife when they cashed the $350.02 check at the bank. At any rate, "the big tall fellow", who called himself "Porter" as aforesaid, stated that he had his boss man's car and would take Leon home to get his money "to prove that I (Leon Cooks) had money before it would be divided."

When they arrived at the Cooks' home the one who called himself "Smith" went in and the one who called himself "Porter" remained in the car. The "little low fellow" Smith in his fast talking manner was not successful explaining their business to Gertrude Cooks to her entire satisfaction, and thereupon Porter was called in to explain to her how it could be that her husband Leon was entitled to $700 of the money because of the fact alone that he was one of the three who saw it picked up from the sidewalk or ground when it was allegedly found; and particularly to explain to her what was neces-

sary to make Leon eligible to share in the division of the money.

"The big tall fellow", Porter, was successful in persuading Leon and Gertrude that Leon should turn over to him all of their money as an essential prerequisite to his right to share in the division of the $2,100. In other words, he was invoking the first part of the scriptural teaching contained in St. Matthew, Chapter 25, verse 29, which reads: "For unto everyone that hath shall be given, and he shall have abundance: . . .".

In great anticipation of receiving the $700 and the return of their $350, Gertrude turned over to her husband Leon this sum of money and he accompanied the defendants Alex Garvin and Ben Rhodes,—known to their victims as Smith and Porter—back to town where Leon "gave" the money to Porter before getting out of the car at the gin, where he and Smith were to wait until Porter could go show the $350 to his boss man. Accordingly Porter departed in the automobile, and it is surprising to note that within a short time he actually came back to where he had left his victim and Smith and thereupon explained to them that his boss man was busy for the moment but that he would go again and see him in a few minutes. Porter then left and of course failed to ever return. Smith remained with Leon for a considerable time more as a matter of caution than from a spirit of compassion, while they made a diligent search for Porter, and Smith finally suggested that he would go in one direction to look for Porter and that Leon could go another way. The result was that Smith also disappeared, leaving the fading flush of hope in the mind of Leon to become replaced by the dull gloom of despair, as he turned his steps homeward to break the sad news to his wife, Gertrude.

Following the foregoing occurrence, Sergeant W. T. Bowling, of the Arkansas State Police, had a "pick-up order" on the driver of the car which was in the posses-

sion of the defendants Alex Garvin and Ben Rhodes on the occasion in question. The message to pick up the driver of the car came over the radio but how or where it originated it was not shown. The defendants were arrested and were later identified in the jail at Forest City, Arkansas, and at the trial, by Leon, Gertrude, and their ten year old daughter Rosa Lee Cooks, as being the same persons who had stolen the $350. Leon and Gertrude were positive in their identification of them, but Rosa Lee, who had less reason to remember them, was unable to readily recognize the men on account of their having changed clothes. None of the witnesses were able to describe the clothing worn by the prisoners either while they were committing their crime in Shaw, Mississippi, or while they were in jail at Forest City, Arkansas, but were merely able to say as to their clothes that they were dressed differently on the two occasions. However, Leon and Gertrude were both able to identify their faces and their relative height, and also by their voices, which they had heard in the jail at Forest City and which Leon had heard for a considerable period of time during much conversation on the day of the theft at Shaw, Mississippi. They recalled that one of them had a fine voice and talked fast, whereas the "big tall fellow" had a heavy voice and talked slowly. They also saw the car behind the jail at Forest City, which appeared to be the same as the one that Porter and Smith had at Shaw, Mississippi, when they stole the money.

Neither of the defendents testified at the trial to explain where they were on October 16, 1948, the day of the theft, but they introduced witnesses to prove an alibi and who testified positively that they were in Jackson, Mississippi, on that day, and under circumstances such as would have precluded the possibility of their being present at Shaw when the crime was committed. It was shown by these alibi witnesses that the defendants came to a rooming house in Jackson at about 4 o'clock in the

morning of the day of the larceny..and that they slept until 3 or 4 o'clock of that Saturday afternoon. These witnesses claim that the defendants had no money and had their meals charged, the charge tickets being introduced, and that they said that they would come back and bring the money for their lodging and meals or send it. That they returned to the rooming house on the next day, about 5 o'clock on Sunday morning, October 17th, took a short nap, checked out and left, stating again that they would return and pay for their lodging.

Thus it will be seen that the testimony is in sharp conflict as to whether or not the defendants were in Shaw, instead of Jackson, Mississippi, on the day of the commission of the crime. We are, therefore, of the opinion that this issue of fact was peculiarly one for the determination of the jury and we are unable to say that the defendants are entitled to a new trial on the ground that the verdict of guilty is contrary to the overwhelming weight of the evidence.

The defendants seek to make much of the fact that the complaining witness Leon Cooks stated that he "gave" the money to "Porter" or Ben Rhodes. But we think the jury clearly understood that he meant thereby that he delivered it to him just before getting out of the automobile after their return to Shaw, since all of the other evidence shows that all of the parties understood the agreement to be that Leon's $350 was to be returned to him along with his one-third of the alleged $2,100 found in the pocketbook. The defendant Rhodes had explained to him that he was entitled to $700 of the money which was alleged to have been found, because of the fact that he was one of three persons who witnessed the finding. He could not be an equal participant in the fund and at the same time be required to part with the title to his own $350. It was, therefore, not error for the trial court to modify the instruction requested by the defendants to the effect that if he gave the money

to the defendants they would not be guilty of larceny, the modification complained of having consisted of the insertion of the words "as a gift".

It is true that there is, and of right ought to be, a natural prejudice against the perpetrators of such a crime as that here involved—a theft committed by preying upon the ignorance and credulity of one who can be made the victim of such a scheme; but we are of the opinion that it was within the province of the jury to reconcile the conflicts in the evidence and to arrive at a true verdict in the case. No reason was shown as to why either the witnesses or the jurors would have wanted to fasten the crime on any particular person or persons, and especially persons whom they had never seen before.

We must, therefore, affirm the judgment and sentence of the trial court.

Affirmed.